# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION

DON GRINDSTAFF,                                    Case No. 1:09-cv-450

    Plaintiff,

                                     Judge Timothy S. Black

    vs.

SUN CHEMICAL CORPORATION,

    Defendant.

## ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

This civil action is before the Court on Defendant's motion for summary judgment

(Doc. 37) and the parties' responsive memoranda (Docs. 42, 50).[1]

## I.    BACKGROUND

Plaintiff Don Grindstaff sued his former employer, Sun Chemical Corporation,

alleging interference with and retaliation for taking leave protected by the Family Medical

Leave Act ("FMLA") and age, race, and disability discrimination.  Defendant moves for

summary judgment on all claims.

Plaintiff worked for Sun Chemical as a production supervisor for approximately

eight years.  In August 2008, Plaintiff took FMLA leave.  In November 2008, Sun

Chemical conducted a reduction in force ("RIF") and Plaintiff's employment was

terminated.

---

[1] Plaintiff seeks oral argument on this motion.  (Doc. 42).  The Court finds, however, that the pleadings are clear on their face and that oral argument is not necessary.  Therefore, Plaintiff's motion for oral argument is **DENIED**.  *See also Whitescarver v. Sabin Robbins Paper Co.*, Case No. C-1-03-911, 2006 U.S. Dist. LEXIS 51524, at *7 (S.D. Ohio July 27, 2006) (J. Dlott) ("Local Rule 7.1(b)(2) leaves the Court with discretion whether to grant a request for oral argument.").

## II.  UNDISPUTED FACTS

### A.  Plaintiff's Employment with Sun Chemical

Sun Chemical operates a plant in Cincinnati, Ohio (the "Chickering Plant") where it produces inks and pigments. (Doc. 34 at 65; Doc. 31, Ex. 6 at SUN000586). The Chickering Plant's manufacturing operations are divided into two primary divisions, known as "Phthalo" and "Azo."[2] (Doc. 31 at 78-79; Doc. 28 at 23, 30; Doc. 35 at 9). The Phthalo and Azo divisions are located in separate buildings, operate independently, and use fundamentally different chemical manufacturing processes. (Doc. 31 at 78–80; Doc. 34 at 65–66; Doc. 30 at 12–13; Doc. 35 at 9; Doc. 33 at 27-28; Doc. 28 at 23, 30).

Plaintiff was hired to work as a Production Supervisor in the Company's Chickering Plant in August 2000. (Doc. 31 at 93). Although he spent the first week after his hire training in Phthalo, the Company decided at the end of that week to transfer Plaintiff to Azo and to assign another new hire to Phthalo. (*Id.* at 81-82, 88). Thereafter, Plaintiff worked as a Production Supervisor in Azo for the duration of his employment. (*Id.* at 81–82, 88). In this role, his responsibilities included supervising the work of hourly operators to ensure an efficient and effective operation, utilizing department

---

[2] The Phthalo division, also known as "Peacock," "Blue," or "BVG," manufactures blue, violet, and green inks and pigments, while the Azo division, which includes the "Tub & Press," "Flush," and "Ovens" departments, manufactures red, orange, and yellow inks and pigments. (Doc. 31 at 78-81; Doc. 28 at 22-23; Doc. 35 at 9). Azo's "Tub & Press" department (a/k/a the "Toner" department) is responsible for mixing chemicals in tubs to make pigments and running these pigments through presses to seperate out the color from the water. (Doc. 31 at 80; Doc. 35 at 79, 98). Azo's "Flush" department mixes the pigments with varnishes and oil to produce a final material that can be used for printing or other applications. (Doc. 31 at 81).

resources to maximize production, overseeing compliance with safety and quality standards, and ensuring that materials were ordered. (*Id.* at 116–122, Ex. 4).

At the time of Plaintiff's termination, there were three Azo supervisors, Leon Doyle, Al Johnson, and Plaintiff. (Doc. 28 at 23-24). These supervisors reported directly to Greg Ervin, Azo Team Leader. (*Id.* at 24, 30). At the time of the RIF, Mr. Ervin was on first shift and Plaintiff was on second or third shift and they seldom encountered each other. (*Id.* at 90-91). When Plaintiff started in the Azo Department, Jeff Galisdorfer was his supervisor and they worked well together. (Doc. 31 at 69-71; 113).

For most of his employment, Plaintiff's responsibilities were limited to the "Tub & Press" department in Azo, where he supervised a total of approximately ten employees, including tub operators, press operators, and porters. (Doc. 31 at 80, 114-115). Plaintiff usually worked second or third shift (10:00 p.m. to 6:30 a.m.). In the spring or early summer of 2008, the Company combined Azo's "Tub & Press" and "Flush" departments and added "Flush" to Plaintiff's area of responsibility. (Doc. 31 at 80-81, Ex. 17; Doc. 35 at 79, 96-97). Management observed that it took Plaintiff a number of months to get comfortable with the Flush processes and Flush Operating personnel. (Doc. 35 at 93-110).

Although Plaintiff was generally considered a good Production Supervisor, there were areas where his supervisors and other managers observed he could improve. (Doc. 31 at 161, 163-168, 172-177, Exs. 7, 8, 9, 10 and 11; Doc. 35 at 77-79, 87-88, 97, 107-

-3-

110; Doc. 33 at 37–ᵉ41; Doc. 28 at 139-148, 181-182).  For example, he was rated by his supervisors on performance evaluations as "needing improvement" when it came to creating a work environment that fostered innovation, that he did not consistently follow through to get to the root cause of problems, and that he could improve when it came to strategic thinking, being assertive, taking initiative, and thinking outside the box.  (Doc. 31 at 161, 163-168, 172-177, Exs. 7, 8, 9, 10 and 11; Doc. 35 at 77-79, 87–90; 96–97; Doc. 33 at 37-41; Doc. 28 at 139, 141, 176, 181–182).  In addition, management noted that Plaintiff demonstrated less flexibility than others when asked to handle new responsibilities, and that his limited experience working outside Azo's Tub department also made him less versatile within the Plant.  (Doc. 31 at 161–163; Doc. 35 at 79, 93-110).

Notwithstanding these criticisms, Plaintiff had a good work record and had not received any warnings.  (Doc. 31 at 250-251, 279).  He was focused on safety and training, and worked well with other employees; he was knowledgeable about scheduling, equipment, and processes.  (*Id.* at 141).  Mr. Ervin believed Plaintiff was "very good" at what he did.  (Doc. 28 at 132, 216).  Mr. Morrison agreed that Plaintiff was a good supervisor who was a "results oriented," dedicated, and ethical employee.  (Doc. 35 at 77-78).

Plaintiff's performance reviews, which Defendant called "performance plans," set goals during the first quarter of every year.  (Doc. 35 at 60-61; Doc. 34 at 24, 38, 40-41,

42-43; Doc. 28 at 119; Doc. 31, Ex. 1). All yearly performance goals allegedly started

with plant-wide goals defined by the Operations Manager. (Doc. 35 at 47, 49, 52; Doc.

34 at 39). Goals were supposed to be revised in June, July, or August, but there was no

expectation that midyear goal setting be documented. (Doc. 34 at 43). Mr. Galisdorfer

indicated that Plaintiff "met performance requirements" for 2003. (Doc. 31, Ex. 11; Doc.

31 at 176-177). Plaintiff likewise met expectations on the 2005 performance evaluation.

(*Id.*, Ex. 9; *Id.* at 172-173).

Mr. Ervin noted that Plaintiff was the most knowledgeable of the supervisors and

was willing to work any shift. (Doc. 31, Ex. 9). He also noted that Plaintiff was always

looking for opportunities to improve. (*Id.*) Plaintiff met overall expectations for 2006

and exceeded expectations in multiple categories. (Doc. 31 at 165, Ex. 8). Mr. Ervin

noted Plaintiff's successful year in safety and his "strong" knowledge of the department.

(*Id.*, Ex. 8). He also noted Plaintiff's exemplary use of the work order system and

willingness to switch shifts to cover for lack of supervision. (*Id.*) On his last evaluation,

for the year 2007, Plaintiff earned an overall "successful" rating (the second highest

possible rating). (Doc. 35 at 81-82; Doc. 28 at 117-118; Doc. 31, Ex. 7). Plaintiff met or

exceeded each of his individual goals. (Doc. 31, Ex. 7). Mr. Morrison did not recall

giving Mr. Ervin any input in completing this review. (Doc. 35 at 47).

In the competency categories, Mr. Ervin rated Plaintiff a 3 ("skilled") or a 4

("talented") in every category except innovation, where he rated Plaintiff a 2 ("needs

improvement"). (Doc. 31, Ex. 8). According to Mr. Ervin, Plaintiff needed improvement in being able to develop new and creative ideas/solutions to problems and in creating a work environment that supported new thinking, rewarded risk taking, reinforced curiosity, and challenged the status quo. (*Id.*, Ex. 7). Plaintiff disagreed with Mr. Ervin and rated himself a 3. (*Id.* at 158-159, 160-161; *Id.*, Ex. 7).

Mr. Ervin singled this area out as an "area for improvement" on Plaintiff's development plan. (Doc. 31, Ex. 7). Beyond a vague conclusion that there were problems that occurred while Plaintiff was on third shift that he should have been able to solve, Mr. Ervin did not cite any specific examples of Plaintiff's innovation failures. (Doc. 28 at 140-141). Although he was "sure" he raised specific examples to Plaintiff, he could not specifically identify any. (*Id.*, at 145-149). Mr. Ervin also told Plaintiff he needed to train in the Flush/Peacock Department to provide the Company more flexibility. (Doc. 31 at 162-164). Plaintiff took over Flush supervisor responsibility in 2008. (Doc. 35 at 118).

**B.    Plaintiff's Back Pain and FMLA Leave**

In July 2008, Plaintiff was experiencing severe pain in his lower back, through his hips, and down his leg. (Doc. 31 at 60-62, 64-65).[3] Plaintiff experienced pain while he

---

[3] Although Plaintiff had previously experienced some back pain in 2006, the pain went away after just a few weeks and did not resurface until July of 2008. (Doc. 32 at 61-63). For the few weeks that Plaintiff experienced pain in 2006, it was merely an "aggravation" and did not limit his daily activities or ability to work. (*Id.* at 63). Plaintiff generally commented to Mr. Evin at the time that he was experiencing some back pain, and Mr. Ervin was sympathetic, but they did not discuss it in any detail, nor did Plaintiff discuss it with others at the Company. Plaintiff ultimately relayed to Mr. Ervin that the pain had subsided and he would not need surgery. (*Id.* at 76-77, 79-80).

was brushing his teeth, showering, dressing, and when he performed his job.  Plaintiff

mentioned the back pain to several Sun Chemical employees, including Mr. Ervin, in

order to keep him apprised of the fact that he might need surgery.  (*Id*. at 65-68, 83-84).

They did not discuss any details about the nature or severity of Plaintiff's symptoms.  (*Id*.

at 83).

On July 28, 2008, Plaintiff applied for FMLA leave to undergo back surgery.

(Doc. 32 at 28–30).  The outpatient surgery was scheduled for August 4, 2008, and

Plaintiff's FMLA certification form indicated that he would need to be off work from the

date of the surgery until late September.  (*Id*. at 29–30, Ex. 13).  Defendant approved

Plaintiff's leave request, and his leave commenced with his surgery on August 4, 2008.

(*Id*. at 30–31, Ex. 24).

Less than a week after Plaintiff's surgery, and before he returned to work, Mr.

Ervin spoke with Plaintiff over the phone and inquired how he was doing.  (Doc. 28 at

51–53).  During this call, Plaintiff claims that Mr. Ervin explained that he was working

on setting Plaintiff's performance goals for the upcoming year, and asked if Plaintiff

would be willing to join him for lunch to discuss the performance plan.  (Doc. 31 at 235-

238).  Although Mr. Ervin did not require Plaintiff to meet him for lunch, Plaintiff had

"no problem" with the request and agreed to meet.  (*Id*. at 240- 241).  Plaintiff explained

to Mr. Ervin that he would not be able to drive for another week, so they agreed to wait

until that time.  (*Id*. at 235–236).  They subsequently met at a Skyline Chili near

Plaintiff's home, where he recalls they discussed his performance goals for the upcoming year, as well as how Plaintiff was feeling, and how everyone was doing at work. (Doc. 32 at 16-17).[4]

Plaintiff alleged that Mr. Ervin's request came as a surprise, as he had never been evaluated at that time of year previously. (Doc. 32 at 22, 43). Mr. Ervin claimed, however, that he did six month reviews every year and that they were retained by HR. (Doc. 28 at 55-56, 121-122). Mr. Ervin admitted that employees were generally expected to participate in the review process and that he was unaware of the impropriety of meeting with Plaintiff while he was still on leave. (*Id.* at 60-64).

At the meeting Mr. Ervin expressed concern about the department's recent drop in productivity and indicated to Plaintiff that he believed Plaintiff was responsible. (Doc. 31 at 239; Doc. 32 at 21-22). Plaintiff explained that the new cosmetic product that the department was producing required several hours of cleaning between its much smaller batches. (Doc. 31 at 239). Mr. Ervin acknowledged this fact. (*Id.* at 239, 249).

At the meeting, Plaintiff told Mr. Ervin that he was very sore and had a hard time moving, but that he was doing the exercises his doctor instructed to build up his back muscles. (Doc. 31 at 241).

Other than his lunch with Mr. Ervin, Plaintiff voluntarily called Leon Doyle, another Production Supervisor, once or twice to check in on how things were going at the

---

[4] Plaintiff admits that his memory is fuzzy as to exactly what was discussed during the telephone call and lunch with Mr. Ervin. (Doc. 31 at 235-238; Doc. 32 at 16-22).

Plant, but he did not have any work-related communications with any other Sun Chemical employees during his FMLA leave. (Doc. 31 at 240; Doc. 32 at 23-24). Plaintiff did not perform any work while on FMLA leave, nor did anyone at Sun Chemical pressure him to hasten his return to work. (Doc. 32 at 37, 40-41). He received short-term disability benefits for the duration of his leave. (*Id*. at 38).

Plaintiff's back surgery was a success and resolved his back pain. (Doc. 31 at 56, Doc. 32 at 275-76). On September 15, 2008, in accordance with his doctor's release, he returned to work full-time at his pre-leave wage and benefit rate with no restrictions. (Doc. 31 at 241-244, Doc. 32 at 37, 40-41, Ex. 25). Plaintiff was still sore and was having trouble getting up and down stairs for a couple of weeks. (Doc. 31 at 242). Plaintiff communicated his difficulty to Mr. Ervin. (*Id*. at 243-244). The Company provided Plaintiff with paperwork to remind him of his right to request additional FMLA leave, if needed. (Doc. 32 at 38-40, Ex. 26). Plaintiff did not request additional FMLA leave because he did not feel further time off was needed. (*Id*. at 39-40).

### C.    Sun Chemical's December 2008 RIF

Over the course of 2008, Sun Chemical was facing an economic downturn and decrease in product demand. (Doc. 31 at 179–180; Doc. 28 at 28-29; Doc. 35 at 17-28; Doc. 34 at 11-12). Significant portions of the Chickering Plant operations were relocated to other facilities, leaving the Chickering Plant overstaffed. (*Id*.) Due to these changes, it was necessary for the Company to reorganize and engage in various layoffs throughout the Plant. (*Id*.)

Dennis Morrison, Operations Manager for the Chickering Plant, had primary responsibility for executing the RIFs. (Doc. 35 at 16). He began by creating a business plan to identify and execute the Company's business objectives moving forward. (*Id*. at 19-20, 22-23, 25, 34-39). Mr. Morrison then created the organizational structure that he considered necessary to fulfill this plan. (*Id*.) At that point, he compared this proposed organizational structure to the Company's existing structure, and consulted with the managers of the various departments to identify which positions in the existing organizational structure could be eliminated. (*Id*.) Through this process, Mr. Morrison ultimately determined in the fall of 2008 that one of the six Production Supervisor positions in the Plant, and one of the two Maintenance Supervisor positions, needed to be eliminated. (*Id*. at 24-26, 38-39; Doc. 29 at 153, Ex. 11; Doc. 30 at 18).

To conduct a comparative analysis of the Production and Maintenance Supervisors who were RIF candidates in the fall of 2008, the Company utilized a tool called a "Re-Selection Worksheet." (Doc. 35 at 22-27; Doc. 34 at 12-13; Doc. 29 at 66-69, 150-157, Ex. 11; Doc. 30 at 14-15, 25, 34). The Re-Selection Worksheet included a matrix of performance-based criteria, with associated definitions, upon which each RIF candidate was to be individually considered and rated. (Doc. 35 at 22-27; Doc. 34 at 12-13, 16; Doc. 29 at 66-69, 150-157, Ex. 11; Doc. 30 at 14-15, 25, 34). The matrix criteria focused on past performance (quantity of work produced, timeliness of results, quality of work, use of resources, customer/client focus, independence, work habits, and past 12-month

-10-

overall performance rating as indicated on a formal performance evaluation), as well as demonstrated technical/professional proficiency and performance potential.  (Doc. 29 at 66- 69, 150-157, Ex. 11; Doc. 35 at 22-23; Doc. 34 at 12-13; Doc. 30 at 14-15, 25, 34).

In November 2008, Dennis Morrison (Operations Manager), Greg Ervin (AZO Team Lead), Peter Gurekovich (Phthalo Team Lead) and Steve Brown (Maintenance and Engineering Team Leader) met to complete the Re-Selection Worksheet matrix for the Production and Maintenance Supervisors who were candidates for the December 2008 RIF.  (Doc. 35 at 22-29, 32; Doc. 30 at 14-15, 18, 25, 34; Doc. 29 at 66-69, 150-157, Ex. 11).  The following Production Supervisors were candidates for the RIF: Plaintiff (age 58),[5] Leon Doyle (age 60), Todd Hess (age 43), Greg Burklo (age 55), Al Johnson (age 53), and Barry Hixon (age 38).  (Doc. 31 at 6, Ex. 12 at DG000363; Doc. 28, Ex. 11 at SUN000226; SUN000791, SUN001152, SUN001180, SUN001386, and SUN001621, attached as Exs. 1-5 to Affid. of D. Lafferty).  The group discussed each RIF candidate and reached a consensus on ratings for each individual as to each of the performance-based criteria on the Re-Selection Worksheet matrix.[6]  (Doc. 29 at 156-157; Doc. 35 at 22-23, 41, 75; Doc. 30 at 25, 49, 89).  As the direct supervisors of the Production

---

[5]  These ages are as of December 4, 2008, the date of Plaintiff's termination.

[6]  The RIF meeting participants considered each name and agreed on a score of 1 ("significant improvement needed"), 3 ("meets expectations"), or 5 ("consistently exceeds expectations") for each category.  (Doc. 29, Ex. 19; Doc. 28 at 156-157; Doc. 29 at 236-237). The participants decided not to use the available scores of 2 ("some improvement needed") or 4 ("often exceeds expectations") on the worksheet.  (Doc. 28 at 157).

Supervisors, Mr. Ervin (age 47) and Mr. Gurekovich (age 43) took the lead on providing input on the Production Supervisors.[7] (Doc. 35 at 41; Doc. 30 at 14-15, 25; Doc. 29 at 66-69, 150-157; Affid. of G. Ervin at ¶ 2). Mr. Morrison (age 45) served as a facilitator of the matrix process and also offered input based on his own professional judgment and experience with each of the RIF candidates. (Doc. 35 at 8, 25, 41). In rating each RIF candidate, the managers relied on their knowledge and professional judgment regarding the candidates' demonstrated job performance, skill sets, and performance potential. (Doc. 35 at 22-23, 41; Doc. 29 at 256; Doc. 30 at 21, 26, 30).

Mr. Ervin claims that in completing each matrix he considered the supervisor's knowledge, productivity, timeliness and qualifications, based on his "professional knowledge." (Doc. 28 at 75, 76, 77; Doc. 35 at 23). But Mr. Ervin does not recall whether he consulted his supervisors' past performance reviews in creating each matrix. (Doc. 28 at 80, 84, 86). Mr. Ervin also admits that he did not review production reports from the prior year. (*Id.* at 167, 168). Instead, he relied on his general knowledge. (*Id.* at 167-168). Mr. Ervin could not recall the relevant information these supporting reports would have included. (*Id.* at 169-170).

According to Mr. Ervin, the quantity category on the Matrix could be judged by considering daily production reports and labor efficiencies. (Doc. 28 at 160). Mr. Ervin admitted that a performance review could also have information relevant to this goal. (*Id.*

---

[7] Mr. Ervin and Mr. Gurekovich were the only meeting participants who drafted year ending 2007 performance evaluations for the RIF candidates. (Doc. 35 at 55-56).

-12-

at 160- 161). However, Mr. Ervin claimed that there was no direct correlation between daily reports to which he had access and the Matrix applied to Plaintiff. (Doc. 29 at 242-244, 247). Such documents were not even at the RIF meeting. (Doc. 28 at 168). Although Mr. Ervin admitted the relevance of tardiness and absences to the question of work habits, he did not review personnel files to determine the number of absences and tardies. (*Id.* at 165-166).

Mr. Gurekovich admits that he did not review Plaintiff's personnel file before the RIF meeting and that at the time of termination he would have deferred to Mr. Ervin's general knowledge of Plaintiff's production level. (Doc. 33 at 20-21). Mr. Gurekovich never drafted any performance reviews for Plaintiff and his only source of knowledge about Plaintiff's production, quality and maintenance came from interactions in supervisor meetings. (*Id.* at 22-23). Neither Mr. Ervin nor Mr. Gurekovich reviewed the RIF candidates' records of performance before providing input. (Doc. 28 at 84, 86-87; Doc. 23 at 29-30).

Once the managers completed their ratings of individuals as to the different matrix criteria, a total raw point score for each RIF candidate was automatically calculated by the matrix tool based on a pre-determined weighted formula. (Doc. 37, Ex. 3 at ¶¶3-4). As a result of this formula, Plaintiff had the lowest raw point score of the six Production Supervisors. (Doc. 29, Ex. 11). Based on this result, and subject to review and ultimate approval by Defendant's human resources and legal departments, Mr. Morrison

-13-

determined that Plaintiff's position should be eliminated.  (Doc. 35 at 16-17, 41; Doc. 29 at 150-152, Ex. 11).[8]

Mr. Morrison and Mr. Ervin met with Plaintiff on December 4, 2008 to advise him that the Company was eliminating his position and terminating his employment due to the decreased demand for flush product.  (Doc. 31 at 15, 185, 189; Doc. 28 at 43, 44-45).  They explained that the Company had determined a RIF was necessary and that he had received the lowest score on a performance-based matrix.  (Doc. 31 at 189).  They provided him with a proposed severance package, which Plaintiff declined, deciding instead to pursue this lawsuit.  (*Id*. at 253-254, Ex. 12).  Allegedly, Mr. Morrison reacted negatively when Plaintiff told him he was going to speak with an attorney before signing a release.  (*Id*. at 189-190).  Plaintiff was the only production supervisor terminated in the November 2008 RIF.  (Doc. 28 at 220-221).

### III.   STANDARD OF REVIEW

A motion for summary judgment should be granted if the evidence submitted to the Court demonstrates that there is no genuine issue as to any material fact, and that the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986);  *Anderson v. Liberty Lobby, Inc.*, 477 U.S.

---

[8] The same Re-Selection Worksheet form and matrix criteria had been used by the same managers to evaluate Plaintiff and other Production Supervisors in connection with an earlier RIF in May of 2008.  (Doc. 28 at 185-189, Ex. 13).  At that time, Plaintiff received the same total raw point score that he received in Novermber 2008.  (*Id.*, Exs. 11, 13).  However, in May 2008, another Production Supervisor received a lower total raw point score than Plaintiff and was therefore selected for termiantion as part of the RIF conducted at that time.  (Doc. 31 at 276; Doc. 28, Exs., 11, 13).

-14-

242, 247-48 (1986).  The moving party has the burden of showing the absence of genuine

disputes over facts which, under the substantive law governing the issue, might affect the

outcome of the action.  *Celotex*, 477 U.S. at 323.  All facts and inferences must be

construed in a light most favorable to the party opposing the motion.  *Matsushita Elec.*

*Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986).

A party opposing a motion for summary judgment "may not rest upon the mere

allegations or denials of his pleading, but . . . must set forth specific facts showing that

there is a genuine issue for trial."  *Anderson*, 477 U.S. at 248 (1986).

## IV.   ANALYSIS

Courts impose a heightened *prima facie* burden on plaintiffs who challenge

terminations that occurred in the context of RIFs.  *Geiger v. Tower Auto*, 579 F.3d 614,

623 (6th Cir. 2009).  In *Geiger*, the Sixth Circuit specifically used the phrase "heightened

standard" to describe the modified fourth prong in a work force reduction situation,

relying on prior cases describing the applicable burden as requiring "additional" evidence

that suggests discrimination.  *Id.* at 626.  Accordingly, with regard to Plaintiff's age, race,

and disability discrimination claims, the usual requirements for stating a *prima facie* case

are modified to include a requirement that Plaintiff present "additional direct,

circumstantial or statistical evidence that the employer singled him out for impermissible

reasons."  *Barnes v. GenCorp, Inc.*, 896 F.2d 1457, 1465 (6th Cir. 1990).[9]

---

[9] *See also Williams v. Emco Maier Corp.*, 212 F.Supp. 2d 780 (S.D. Ohio 2002) (applying heightened *prima facie* standard in RIF case involving disability discrimination claim); *Ridenour v. Lawson Co.*, 791 F.2d 52, 57 (6th Cir. 1986) (applying heightened standard to age discrimination claim in RIF case).

Plaintiff claims that this increased burden of proof is improper. Specifically, Plaintiff maintains that requiring that employees terminated in a RIF provide more evidence of discrimination than those not so terminated violates *Reeves'* rejection of the pretext-plus approach. *Reeves v. Sanderson Plumbing*, 530 U.S. 133, 140, 141, 149 (2000).[10] However, the cases cited by Plaintiff do not support his position. For example, in *Blair v. Henry Filters*, 505 F.3d 517, 529 (6th Cir. 2007), the Sixth Circuit reiterated the heightened *prima facie* requirement in the RIF context. The Court found that the plaintiff in *Blair* offered sufficient evidence to meet the *prima facie* requirement by showing that the decisionmaker had repeatedly mocked the plaintiff's age, removed the plaintiff from a lucrative account because he was "too old," and told other employees that he wanted younger salesmen. *Id*. at 530, 531-32. Plaintiff has not offered any evidence of age discrimination in order to establish the fourth element of a *prima facie* case.

## A.     Age Discrimination

Plaintiff claims that Defendant discriminated against him on the basis of age in violation of the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621, *et seq.* To make a *prima facie* claim for age discrimination Plaintiff must demonstrate that: (1) he was a member of the protected class; (2) he suffered an adverse employment

---

[10]  *Reeves* rejected a Fifth Circuit requirement that "a plaintiff must produce additional, independent evidence of discrimination *after* establishing a *prima facie* case and pretext." (Doc. 42 at 23) (emphasis added). This is irrelevant to the issue at hand, *i.e.*, the fourth element of a *prima facie* case in the RIF context.

action; (3) he was qualified for the position; and (4) additional direct, circumstantial, or statistical evidence that Defendant singled him out based on his age. *Geiger*, 579 F. 3d at 622-623; *Godfredson v. Hess & Clark,* 173 F.3d 365, 371 (6th Cir. 1999).

### 1.    *Prima Facie Case*

The first three prongs of Plaintiff's age discrimination claim are undisputed. However, Plaintiff fails to satisfy his *prima facie* burden on the age discrimination claim because he fails to offer direct, circumstantial, or statistical evidence that Defendant singled him out because of his age. Absent direct, circumstantial, or statistical evidence that the Company singled out individuals based on age or some other protected category, Defendant "was free to reorganize and eliminate positions in whatever lawful manner it chose." *Wilson v. Firestone Tire & Rubber Co.*, 932 F.2d 510, 517 (6th Cir. 1991).

When asked to explain the basis of his age discrimination claim, Plaintiff offers his view that the Company retained younger Production Supervisors with "less seniority" and "less experience."[11] (Doc. 31 at 198). In particular, Plaintiff focuses on four employees:

---

[11] Plaintiff's opinion that "seniority" and "experience" should have controlled the Company's decision-making process is irrelevant to his claim of age discrimination. Defendant is entitled to establish its own criteria for its RIF selection process. *Wilson*, 932 F.2d at 517 ("As long as employers do not act with discriminatory intent, they may eliminate positions in the name of economic necessity or efficiency, even when those positions are held by more senior workers."); *Mitchom v. HCA Mgmt. Servs.*, No. 3:08-1224, 2009 U.S. Dist. LEXIS 107353, at *3 (M.D. Tenn. Nov. 17, 2009) (finding a plaintiff's contention that layoffs should have been based on seniority and experience insufficient to support a *prima facie* case of discrimination).

John Russell, Al Johnson,[12] Todd Hess, and Barry Hixon. (*Id.* at 198-199). Plaintiff makes an age-based assumption that because Mr. Hess and Mr. Hixon were younger and/or had allegedly been with the Company for a shorter period of time, that they were less qualified to serve the needs of the business. (Doc. 31 at 201-204, 213-215). Mr. Hess and Mr. Hixon both worked in Phthalo and reported to Peter Gurekovich. (Doc. 31 at 199-204, 212-213; Doc. 29, Ex. 11; Doc. 33 at 70, 74). Because they worked in a different division and reported to a different supervisor, Plaintiff admits that he had little to no opportunity to observe their work performance, and he had no knowledge concerning their skills and qualifications. (Doc. 31 at 199-204; 209-216; 220-222).

---

[12] Plaintiff does not dispute Defendant's contention that Mr. Russell and Mr. Johnson are improper comparators. Accordingly, the Court will assume that Plaintiff concedes that Mr. Russell and Mr. Johnson are not similarly situated. It is undisputed that Mr. Russell was not a Production Supervisor at the time of the RIF that impacted Plaintiff, and his position was therefore not considered for elimination in the RIF. (Doc. 31 at 205; Doc. 21 at 186). Moreover, Plaintiff's reliance on the fact that two of the Production Supervisors retained in lieu of him were significantly younger than him ignores the fact that the other three Production Supervisors were not significantly younger than him. One was two years older than him (Mr. Russell) and the others were only three and five years younger than him (Mr. Johnson), which is not significantly younger as a matter of law. *Grosjean v. First Energy Corp.,* 349 F.3d 332, 340 (6th Cir. 2003) (age difference of six years or less is not substantially younger as required for demonstrating age discrimination). This fact negates any inference of age discrimination. "[T]he Sixth Circuit has considered the fact that a company retained other older employees in a reduction in force as evidence the employer's employment decisions were not motivated by age discrimination." *Reynolds v. Georgia-Pacific Corp.*, No. C-1-03-459, 2006 U.S. Dist. LEXIS 5356 at *14 (S.D. Ohio Jan. 25, 2006). *See also Ferrette v. Cuyahoga Cty. Bd. of Elections*, 105 F. App'x 722, 726 (6th Cir. 2004) ("The ages of the senior clerks retained in the voting locations/inspection department do not suggest that the Board favored younger workers; three out of the four retained, as we have said, were over 50, and one was over 70."); *Holtzclaw v. McCullough*, No. 4:04cv-81, 2005 U.S. Dist. LEXIS 14063, *4 (W.D. Ky. 2005) ("While most of the group offered positions in the training program were 'substantially younger' than the Plaintiff, the fact that one was not serves to negate the inference that age was a factor in the selection process.").

Additionally, Defendant presents substantial evidence that both Mr. Hess[13] and Mr. Hixon[14] were well qualified employees. Plaintiff argues that Defendant's explanation of the relative qualifications of the significantly younger Mr. Hess and Mr. Hixon is without merit, because a jury could disagree with Defendant's claims about their relative qualifications. However, Plaintiff's subjective beliefs regarding his own qualifications, and his speculation and self-serving opinions as to the lesser qualifications of others, are

---

[13] Mr. Hess demonstrated strong skills and solid qualifications as judged by those who worked with him and had knowledge of his performance. (Doc. 33 at 70-71; *See* SUN001035-1042, SUN001027-1034, SUN001043-1050, SUN001053-1060, SUN001062-1069, SUN001071-1084, attached as Ex. 2 to Affid. of D. Lafferty). For example, of all of the Production Supervisors considered for the December 2008 RIF, Mr. Hess was the only supervisor who had received an overall rating of "Excels" on his 2007 performance evaluation. (*Id.* at 77; SUN001071, SUN001075, attached as Ex. 2 to Affid. of D. Lafferty). Mr. Gurekovich observed that Mr. Hess was a "high achiever" who met or exceeded daily production goals, was a strong driver of safety, and was process knowledgeable. (*Id.* at 70-71). Mr. Hess' personnel file reflects that in recognition of his skills and performance, he was promoted to the role of Senior Production Supervisor in 2005, and that contrary to Plaintiff's age-based assumption, Mr. Hess had worked for Sun Chemical since 1989, longer than Plaintiff. (SUN 001152, SUN001068, Ex. 2 to Affid. of D. Lafferty).

[14] Likewise, the record shows that Mr. Hixon was a solid performer. (Doc. 33 at 74, 77; Doc. 28, Ex. 16; *See* SUN001214-1219, attached as Ex. 3 to Affid. of D. Lafferty; Doc. 35 at 110). At the time of the December 2008 RIF, he had received an overall rating of "Successful" from Mr. Gurekovich on his 2007 performance evaluation, was praised for, among other attributes, his "better understanding of all departments," and was recognized by management in the fall of 2008 as a Production Supervisor who was "careful to analyze a situation before offering a solution" and held his personnel "accountable for their actions." (Doc. 33 at 77; Doc. 29, Ex. 16; SUN001214-1219, Ex. 3 to Affid. of D. Lafferty). Mr. Gurekovich further observed that Mr. Hixon effectively assigned and scheduled manufacturing needs to achieve daily production schedules, was a strong proponent of safety, and was detailed in his maintenance activities as well as follow-through with his technical knowledge. (Doc. 33 at 74). Mr. Hixon's personnel file further reflects that he came to Sun Chemical with past work experience as a supervisor, and that he oversaw multiple departments within Sun Chemical's Phthalo division — Spray Dry, Grind, and Mix and Press. (*See* SUN001177, SUN001175-76, Ex. 3 to Affid. of D. Lafferty).

not evidence of age discrimination.[15]

Plaintiff's reliance on *Skalka v. Fernald Envtl. Restoration Mgmt. Corp.*, 178 F.3d 414 (6th Cir. 1999), for the proposition that he can establish a *prima facie* case of age discrimination merely by showing that "employees outside the protected class were retained in the same position from which Grindstaff was terminated" is flawed for several reasons. (Doc. 42 at 23). First, there was no such showing in *Skalka*, which involved the appeal of a jury verdict finding age discrimination. The Sixth Circuit held that the jury was entitled to its finding that age discrimination had occurred because "Skalka was the oldest member of his peer group and was laid off despite being rated the most competent," and the employer's explanation for deviating from its RIF ranking system in deciding to lay off Skalka was not credible. *Id*. at 421-422. That is precisely the type of additional direct, circumstantial, or statistical evidence required to establish a *prima facie* case of age discrimination in the RIF context. *Geiger*, 579 F.3d at 624, 626 (because the plaintiff "failed to provide additional evidence that he was terminated . . . on account of his age, as required by the heightened standard for workforce reduction cases," he did not establish a *prima facie* case of age discrimination). Here, because Plaintiff has not

---

[15] *See, e.g.*, *LaGrant v. Gulf & W. Mfg. Co.*, 748 F.2d 1087, 1091 (6th Cir. 1984) (plaintiff's subjective belief regarding his qualifications versus others is not sufficient to satisfy *prima facie* burden); *Hein v. All American Plywood Co.*, 232 F.3d 482, 488, 490 (6th Cir. 2000) (evidence of age discrimination necessary to survive summary judgment cannot be based on conclusory allegations or subjective beliefs); *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 584-585 (6th Cir. 1992) ("conclusory allegations and subjective beliefs...are wholly insufficient...to establish a claim of discrimination as a matter of law"); *Wrenn v. Gould*, 808 F.2d 493, 502 (6th Cir. 1987) (plaintiff's perception of what qualifications were required is irrelevant).

presented any additional direct, circumstantial, or statistical evidence of age discrimination, he has failed to meet his *prima facie* burden, and his age discrimination claim must be dismissed.

### 2. *Defendant's non-discriminatory reason for termination*

Assuming *arguendo* that Plaintiff established a *prima facie* case, although he has not, the burden of production would shift to Defendant to articulate a legitimate, nondiscriminatory reason for including Plaintiff in the RIF. *Texas Dep't of Cmty. Affairs v. Burdine,* 450 U.S. 248, 253 (1981). It has done so. Defendant maintains that Plaintiff was terminated in the November 2008 RIF because he received the lowest total score among all of the Production Supervisors rated on the RIF selection matrix. Accordingly, the burden reverts back to Plaintiff to establish pretext.

### 3. *Whether the RIF was pretext for discriminatory animus*

Plaintiff must then show that Defendant's articulated reason is mere pretext. In order to establish pretext, Plaintiff must demonstrate that the reasons given by Defendant for his discharge: (i) had no basis in fact, or (ii) did not actually motivate the decision, or (iii) were not sufficient to warrant the action taken. *Manzer v. Diamond Shamrock Chem. Co.*, 29 F.3d 1078, 1083 (6th Cir. 1994). A *prima facie* case, plus a showing that Defendant's articulated reason is false, is sufficient for Plaintiff to prevail. *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 509-510 (1993); *Kline v. Tennessee Valley Auth.*, 128 F.3d 337, 347 (6th Cir. 1997).

-21-

The Sixth Circuit has adopted an "honest belief" rule with regard to an employer's proffered reason for discharging an employee. *Smith v. Chrysler Corp.*, 155 F.3d 799, 806-07 (6th Cir. 1998). "Under this rule, as long as an employer has an honest belief in its proffered nondiscriminatory reason for discharging an employee, the employee cannot establish that the reason was pretextual simply because it is ultimately shown to be incorrect." *Majewski v. Auto. Data Processing, Inc.*, 274 F.3d 1106, 1117 (6th Cir. 2001). An employer has an honest belief in its reason for discharging the employee "where the employer reasonably relied on the particularized facts that were before it at the time the decision was made." *Id.*

Although Plaintiff claims that the Sixth Circuit eliminated its deference to the employer's business judgment in *Wexler v. White's Fine Furniture, Inc.*, 317 F.3d 564 (6th Cir. 2003), Plaintiff's analysis is incorrect. While the court in *Wexler* observed that an employer's business judgment is not an "absolute defense" to a claim of discrimination, the court did not hold that disagreement (or even reasonable disagreement) with the employer's decision is enough to establish pretext. Rather, to attack Defendant's business judgment, Plaintiff must produce evidence that could support a finding that the employer's decision was unreasonable, or, "so ridden with error that defendant could not honestly have relied upon it." *Id.* at 576 (quoting *In re Lewis*, 845 F.2d 624, 633 (6th Cir. 1988)). In light of the undisputed evidence, Plaintiff fails to present evidence that the elimination of his position was anything but a reasonable exercise of business judgment.

-22-

## B.     Reverse Race Discrimination

Plaintiff, who is Caucasian, also alleges "reverse" race discrimination under Ohio Revised Code § 4112.[16]  In cases of "reverse" race discrimination, where, as here, the plaintiff is not a member of a racial minority, the Sixth Circuit has held that, in order to establish the first prong of the test, the plaintiff must demonstrate "'background circumstances to support the suspicion that the defendant is that unusual employer who discriminates against the majority.'"  *Grizzell v. City of Columbus Div. of Police*, 461 F.3d 711, 719-20 (6th Cir. 2006) (quoting *Zambetti v. Cuyahoga Cmty. College*, 314 F.3d 249, 255 (6th Cir. 2002)).  To establish these background circumstances, the plaintiff can present "evidence of [defendants'] unlawful consideration of race as a factor in hiring in the past [to] justif[y] a suspicion that incidents of capricious discrimination against whites because of their race may be likely."  *Zambetti*, 314 F.3d at 256.  Alternatively, a plaintiff can demonstrate background circumstances by showing simply that the employer was a member of the same minority race as the employees he was promoting.  *Morris v. Family Dollar Stores of Ohio, Inc.*, 320 F. App'x 330, 340 n.11 (6th Cir. 2009) (citing *Zambetti*, 314 F.3d at 257 (relying on the single factor that the police chief was African-American and was promoting African-Americans)).

---

[16]  The elements of a discrimination case are the same under federal Title VII law and Ohio law.  *Graham v. Best Buy Stores*, 298 Fed.Appx. 487, 493, fn.5 (6th Cir. 2008).

Although Plaintiff argues that some courts have expressed "misgivings" about the heightened standard in reverse race discrimination cases (Doc. 42 at 25-26), none of the cases cited alters the well-established *prima facie* burden or otherwise supports his race discrimination claim.[17]

Accordingly, to establish a *prima facie* case of "reverse" race discrimination in the context of a RIF, Plaintiff must demonstrate: (1) that background circumstances support the suspicion that Defendant is that "unusual employer who discriminates against the majority"; (2) that he was qualified for the job; (3) that he suffered an adverse employment action; and (4) additional direct, circumstantial, or statistical evidence tending to indicate that Sun Chemical singled him out for discharge for impermissible reasons. *Wilson v. Ohio Dep't of Job & Family Servs.*, 178 F. App'x 457, 465 (6th Cir. 2006); *Anderson v. Avon Products, Inc.*, No. 1:07cv205, 2008 U.S. Dist. LEXIS 57741, at *10 (S.D. Ohio July 29, 2008), *affirmed by* 340 F.App'x 284 (6th Cir. 2009).

In considering whether the heightened *prima facie* standard has been met, the Sixth Circuit has held that when a majority of employees in the plaintiff's position are white men, this is evidence that the employer does not discriminate against the majority. *Murray v. Thistledown Racing Club, Inc.*, 770 F.2d 68 (6th Cir. 1985). Plaintiff's claim

---

[17] For example, Plaintiff's citation to *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 78 (1998), for the proposition that members of the same protected class can discriminate against one another misses the point. (Doc. 42 at 26-27). Plaintiff has not met his burden to present "background circumstances" supporting a suspicion that Defendant is the unusual employer who discriminates against the majority. The fact that the decisionmakers were of the same majority race as Plaintiff is not such a "background circumstance."

is further undermined by the undisputed fact that all of the managers involved in the RIF selection process were white males – just like Plaintiff. (Doc. 32 at 59). *See*, *e.g.*, *Anderson*, 2008 U.S. Dist. LEXIS 57741, at *11 (white male plaintiff failed to make *prima facie* showing of reverse discrimination as to white male supervisor's alleged failure to consider plaintiff for position); *cf. Zambetti*, 314 F.3d at 257 (*prima facie* case of reverse discrimination may be supported where adverse employment decision made by individual who is member of protected group).

When asked at deposition about the basis for his claim, the only "evidence" offered by Plaintiff was that one of the five Production Supervisors retained in the RIF, Barry Hixon, was African-American. (Doc. 32 at 54-58). Plaintiff conceded that his claim of "reverse" race discrimination was mere speculation and that he had "no proof." (*Id.* at 58). In fact, he could not even recall Mr. Hixon's name, and conceded that he knew nothing about Mr. Hixon's job performance, work experience, training, or education. (*Id*. at 54-55). His only recollection of Mr. Hixon was that he was African-American, worked in Phthalo, and is believed to be younger than Plaintiff. (*Id*. at 54-57). According to Plaintiff, "[h]e was the only supervisor in the plant that was black, so I feel, yes, they kept him because of his race." (*Id*. at 55).

For example, in *Sampson v. Sec'y of Transp*., No. 98-5669, 1999 U.S. App. LEXIS 14142 (6th Cir. 1999), the Court found that the plaintiff had satisfied the "background circumstances" requirement for a *prima facie* case by submitting evidence that the

employer had policies reflecting "an organizational preference for establishing a diverse group of "employees" and evidence suggesting that the defendant had relied on these diversity policies in promoting an African American employee in lieu of the white plaintiff. *Id.* at 4-5.  Conversely, in the instant case there is no evidence that any kind of policy favoring minorities was in place and there is no evidence of any other background circumstances suggesting that Defendant is the unusual employer who discriminates against the majority.

Plaintiff's conclusory allegations offer no support for his discrimination claim. *See Anderson,* 2008 U.S. Dist. LEXIS 57741, at *11 ("bare allegations" not sufficient to create genuine issue of material fact on reverse discrimination claim).  Indeed, Plaintiff's assertion that race must be the reason Mr. Hixon was retained ignores the record in this case and is the very type of speculation that the Sixth Circuit's heightened standard for "reverse" race discrimination cases prevent.  It is undisputed that in determining which Production Supervisor position to eliminate, the Company considered each RIF candidate against the same performance-related matrix criteria.  (Doc. 28 at 156-157, Ex. 11; Doc. 35 at 22-23, 41, 75; Doc. 33 at 25, 49, 89).

Not only has Plaintiff proffered no background circumstances suggesting that Defendant is the unusual employer who discriminates against the majority, but the evidence is to the contrary because it is undisputed that the majority of production supervisors retained in the RIF were white, the same race as Plaintiff.  There is simply no

-26-

evidence to support a finding that Defendant singled Plaintiff out because of his race, or that Plaintiff's race had anything to do with the Company's decision to eliminate his position. Accordingly, Plaintiff's "reverse" race discrimination claim is dismissed as a matter of law.

### C. Disability Discrimination

Plaintiff alleges that he was "regarded as disabled" and discriminated against in violation of Ohio Revised Code §4112. Pursuant to Ohio Rev. Code §4112.01(A)(13):

> [D]isability means a physical or mental impairment that substantially limits one or more major life activities, including the functions of caring for one's self, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working; a record of physical or mental impairment; or being regarded as having a physical or mental impairment.

The ADA prohibits a covered employer from "discriminat[ing] against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). Similar to the ADA's general prohibition, Ohio law makes it unlawful for an employer, "because of the . . . disability . . . of any person, to discharge without just cause, to refuse to hire, or otherwise to discriminate against that person with respect to hire, tenure, terms, conditions, or privileges of employment, or any matter directly or indirectly related to employment." Ohio Rev. Code § 4112.02(A). Courts are permitted to look to regulations

-27-

and cases interpreting the ADA when applying the Ohio law. *See Knapp v. City of Columbus*, 192 F. App'x 323, 328 (6th Cir. 2006); *Columbus Civil Serv. Comm'n v. McGlone*, 82 Ohio St. 3d 569, 573 (1998).

> In order to be "regarded as disabled":
>
> (1) a covered entity mistakenly believes that a person has a physical impairment that substantially limits one or more major life activities, or (2) a covered entity mistakenly believes that an actual, nonlimiting impairment substantially limits one or more major life activities. In both cases, it is necessary that a covered entity entertain misperceptions about the individual -- it must believe either that one has a substantially limiting impairment that one does not have or that one has a substantially limiting impairment when, in fact, the impairment is not so limiting.

*Sutton v. United Air Lines, Inc.*, 527 U.S. 471, 489 (1999).[18] Additionally, in the RIF context, a plaintiff must present "additional direct, circumstantial or statistical evidence" that the employer singled him out for termination based on a perceived disability. *Williams v. Emco Maier Corp.*, 212 F. Supp. 2d 780, 783-84 (S.D. Ohio 2002).

Plaintiff's reliance on *Ross v. Campbell Soup Co.*, 237 F.3d 701 (6th Cir. 2001), for the proposition that "evidence of a pretextual reason for the adverse action may also tend to prove that Defendant regarded Plaintiff as disabled" is flawed. (Doc. 42 at 28). As discussed below, Plaintiff has presented no evidence of a pretextual reason for his

---

[18] *See also Daugherty v. Sajar Plastics, Inc.*, 544 F.3d 696, 704 (6th Cir. 2008) (To establish a *prima facie* case under a "regarded as" theory of disability discrimination, a plaintiff is required to show that the employer "entertains misperceptions" about him by (1) mistakenly believing that he has a physical improvement that substantially limits one or more major life activities, or (2) mistakenly believing that an actual, non-limiting impairment substantially limits one or more major life activities).

termination in the RIF. Furthermore, the plaintiff in *Ross*, who suffered a series of five back injuries during his employment, presented evidence that one of his supervisors commented during a performance evaluation, "we can't have any more of this back thing" and that another supervisor circulated a memorandum to company management saying, "when can we bring this problem person to a termination status. p.s. back case." *Id.* at 703-704. The Sixth Circuit found that management's identification of the plaintiff as a "back case" demonstrated a genuine issue of material fact that "Campbell Soup Co. regarded Ross through the lens of his medical condition." *Id.* at 707. By contrast, because Plaintiff has presented no evidence, there can be no inference that the decisionmakers regarded him as disabled and terminated him for such a reason. Therefore, his "regarded as" disability discrimination claim must be dismissed as a matter of law.

Even if Plaintiff could clear his other *prima facie* hurdles — which he cannot — he fails to establish a *prima facie* case of disability discrimination because he has no additional direct, circumstantial, or statistical evidence that Sun Chemical eliminated his position based on an alleged disability. He admits that he has no evidence of any verbal comments or writings indicating that his back condition had anything to do with his termination. (Doc. 32 at 90). Further, he admits he has no evidence that anyone at Sun Chemical reacted to his back problems in any way that was disrespectful or unsympathetic, or that Sun Chemical was unwilling to accommodate any problems Plaintiff was experiencing related to his back. (*Id.* at 88).

In support of his disability discrimination claim, Plaintiff relies on his medical leave and speculates that the Company wanted to retain "younger people in better health." (Doc. 31 at 244, 251, Doc. 32 at 89-90). According to Plaintiff's own testimony, however, two other Production Supervisors who scored higher than Plaintiff on the matrix and were retained, Mr. Johnson (age 53) and Mr. Doyle (age 60), had their own health issues known to the Company and had taken on leaves of absence. (Doc. 31 at 245; Doc. 32 at 84-86). Beyond Mr. Johnson and Mr. Doyle, Plaintiff admits that he had no knowledge as to the health of the other Production Supervisors considered for the RIF. (Doc. 31 at 245). Accordingly, Plaintiff fails on multiple grounds to demonstrate a *prima facie* case of disability discrimination and his claim must be dismissed as a matter of law. *See Plant v. Morton Int'l, Inc.*, 212 F.3d 929, 938 (6th Cir. 2000) (knowledge of an employee's medical problems and modification of responsibilities based upon them is not sufficient evidence that the company regarded the employee as disabled under the ADA).[19]

The Court concludes that, even when viewing the evidence in the light most favorable to Plaintiff, he has failed to show that Defendant regarded him as substantially limited in any major life activity. Consequently, Plaintiff cannot show that he is disabled under the ADA. Accordingly, Defendant is entitled to summary judgment as it relates to Plaintiff's claim of "regarded as" disability discrimination.

---

[19] *Dabney v. Ohio Dep't of Admin. Servs.*, Case No. 2:04-CV-528, 2006 U.S. Dist. LEXIS 23435, at *28-29 (S.D. Ohio Mar. 22, 2006) (holding that "defendant's past accommodation of plaintiff's medical conditions does not demonstrate that defendant regarded her as disabled").

## D.  FMLA Claims

Finally, Plaintiff claims that Defendant interfered with his exercise of rights under

the FMLA[20] and terminated his employment in retaliation for his use of FMLA leave.

The FMLA prohibits qualifying employers from "interfer[ing] with, restrain[ing], or

deny[ing] the exercise of or the attempt to exercise, any right provided under th[e]

[FMLA]."  29 U.S.C. § 2615(a)(1).

### 1.  Whether Defendant interfered with Plaintiff's FLMA leave

To prevail under an interference theory, a plaintiff must establish that: (1) he is an

eligible employee; (2) the defendant is an employer; (3) he was entitled to leave under the

FMLA; (4) he gave the employer notice of his intention to take leave; and (5) the

employer denied him FMLA benefits to which he was entitled. *Novak v. MetroHealth*

*Med. Ctr.*, 503 F.3d 572, 577-578 (6th Cir. 2007).

In this case, Plaintiff has no evidence that Defendant denied him any FMLA

benefit to which he was entitled, and his failure to meet this critical element renders him

unable to survive summary judgment.  Plaintiff does not dispute that Defendant readily

granted him all of the FMLA leave he requested for his August 2008 back surgery, and

provided him with short term disability benefits during his absence.  (Doc. 32 at 38-40).

---

[20]  The FMLA requires eligible employers to provide up to twelve weeks of leave per year to employees to care for a child, spouse, or parent with a "serious health condition" or for the employee's own serious health condition.  29 U.S.C. § 2612(a).  Congress passed the FMLA "to balance the demands of the workplace with the needs of families, to promote the stability and economic security of families, and to promote national interests in preserving family integrity."  29 U.S.C. § 2601(b)(1).

Plaintiff also admits that he did not perform any work while on FMLA leave. (*Id.* at 40-41). He also concedes that at the completion of this leave, Sun Chemical accepted him back at work, into his former supervisory position, at his pre-leave wage and benefit rate. (Doc. 31 at 241-244, Doc. 32 at 37, 40-41).

Plaintiff's interference claim is based on his admittedly vague recollection of a single lunch meeting he had with his supervisor, Greg Ervin, while out on leave. (Doc. 31 at 235-238, Doc. 32 at 16-22, 26-27). As explained in Section II, Mr. Ervin spoke to Plaintiff after his surgery and inquired how Plaintiff was doing. During this call, Plaintiff claims that Mr. Ervin asked if he would join him for lunch to discuss his performance plan for the upcoming year. (Doc. 31 at 235-238). Plaintiff agreed, and the two met at a Skyline Chili near Plaintiff's home, where they discussed his performance goals for the upcoming year, how Plaintiff was feeling, and how people at work were doing. (Doc. 31 at 235–36, Doc. 32 at 16-17). According to Plaintiff, Mr. Ervin did not require him to attend the lunch. (Doc. 31 at 240-241). Moreover, Plaintiff did not object to meeting Mr. Ervin for lunch, and never complained of being pressured to work during leave or to return to work. (*Id.* at 240-241). Plaintiff admits that the lunch with Mr. Ervin did not have any effect on his recovery. (Doc. 23 at 26).

Based on this record, there is no evidence that Defendant interfered with Plaintiff's FMLA leave. Plaintiff received all of the time off work that he requested, he did not perform any work during his leave, and he was immediately reinstated to the same

-32-

position, pay, and benefits at the end of his leave. Weighed against these undisputed facts, Plaintiff's off-site lunch with Mr. Ervin, where both work and non-work related matters were discussed, is not a denial of Plaintiff's rights and privileges under the FMLA.[21] *See, e.g., Soehner v. Time Warner Cable, Inc.*, No. 1:08-CV-166, 2009 U.S. Dist. LEXIS 106619, at *5 (S.D. Ohio Nov. 16, 2009) (finding no FMLA interference where plaintiff performed work while on leave without informing his supervisor that he did not want to work or was too fatigued to do so).[22] Because Plaintiff "cannot show that defendant did not provide him the FMLA leave/benefits to which he was entitled," Plaintiff cannot create an issue of fact that Defendant interfered with his FMLA benefits.

### 2. *Whether Plaintiff was discharged in retaliation for his use of FMLA leave*

To state a *prima facie* case of FMLA retaliation, a plaintiff must establish that "(1) he was engaged in an activity protected by the FMLA; (2) the employer knew that he was exercising her rights under the FMLA; (3) after learning of the employee's exercise of FMLA rights, the employer took an employment action adverse to him; and (4) there was a causal connection between the protected FMLA activity and the adverse employment action." *Killian v. Yorozu Auto. Tennessee, Inc.*, 454 F.3d 549, 556 (6th Cir.

---

[21] Plaintiff fails to cite any case law to support his position that his lunch with Mr. Ervin effectively interfered with his FMLA leave.

[22] *Reilly v. Revlon, Inc.*, 620 F. Supp. 2d 524, 537 (S.D.N.Y. 2009) (dismissing plaintiff's FMLA interference claims because she did not produce any work product or complete any assignments during her leave, and fielding work-related calls while on leave is a "professional courtesy").

2006).

In this case, Plaintiff does not establish a causal connection between his FMLA leave and the Company's decision to eliminate his position in the RIF.[23] When asked at his deposition why he believed his termination was due to his FMLA leave, Plaintiff relied on the following theories: (1) his assumption that the Company wanted to retain younger people in better health; (2) a single alleged comment by Leon Doyle, a fellow Production Supervisor, in which Doyle opined that the Company would try to "get rid of" Plaintiff because of his FMLA leave; and (3) the fact that the RIF took place approximately two months after his lunch with Mr. Ervin and his return from FMLA leave.[24]

Plaintiff's speculation that the Company wanted to retain "younger people in better health" is without record support. (Doc. 31 at 84-86, 89-90, 244-245).  With regard to the

---

[23] Plaintiff relies on *Erpenbeck v. Premier Golf Mgmt., Inc.*, No. C-1-05-419, 2006 U.S. Dist. LEXIS 85271 (S.D. Ohio, Nov. 22, 2006), for the proposition that he is not required to present any direct evidence of a retaliatory motive. (Doc. 42 at 14).  That case, which involved an age discrimination claim, has no bearing on the present case.  The Court in *Erpenbeck* found that there were genuine issues of fact as to whether the plaintiff was treated less favorably than similarly situated younger employees because the plaintiff presented evidence that the defendant had "given different explanations at different times for terminating his employment" and because there was a credibility issue as to whether the decisionmaker knew the plaintiff's age in light of his access to the plaintiff's personnel file providing his age. *Id.* at 3, 8.  That is, the Court found that the inconsistencies and the credibility issue were sufficient to determine that a reasonable jury could find evidence of age discrimination. *Id.*  In this case, there is no credibility issue or inconsistency in the stated reason for Plaintiff's termination.  Because Plaintiff has pointed to no indicia of a retaliatory motive in the RIF decision, and instead has only offered speculation based on temporal proximity, he has failed to establish a *prima facie* case of FMLA retaliation.

[24] Sun Chemical terminated Plaintiff no more than ten weeks after he returned from FMLA leave.

alleged comment by Leon Doyle, Plaintiff claims that Mr. Doyle told him the Company
had tried to get rid of him when he was on FMLA leave for a heart attack, and that Mr.
Doyle said, "The first chance they get, they'll get rid of you."[25]  (Doc. 31 at 245-246).
Assuming the allegation is true, a comment by a peer and non-decisionmaker is not
evidence of retaliation.  *Geiger*, 579 F.3d at 624.

Plaintiff cites a series of cases holding that temporal proximity (between the
protected action and the allegedly retaliatory discharge) is sufficient to establish a *prima
facie* case.  *See, e.g., Dicarlo v. Potter*, 358 F.3d 408, 421 (6th Cir. 2004); *Dage v. Time
Warner Cable*, 395 F.Supp.2d 668, 677 (S.D. Ohio 2005).[26]  However, none of the cases
Plaintiff cites hold that temporal proximity alone is sufficient for a *prima facie* case in the
RIF context.  In fact, courts have consistently recognized that a RIF represents a unique
set of circumstances where competent employees are terminated for a business necessity.
*Whitt v. Lockheed Martin Util. Servs., Inc.*, 209 F. Supp. 2d 787, 793 (S.D. Ohio 2002).

---

[25] Leon Doyle, who was on FMLA leave in 2007 and remains employed by the Company
today, denies making such a comment to Plaintiff, and further denies ever believing that the
Company was attempting to get rid of him.  (Doc. 27 at 29, 39-40).

[26] There are also a significant number of non-RIF Sixth Circuit case holding that temporal
proximity between protected activity and an adverse employment action may not give rise to a
finding of a causal connection unless it is "coupled with other indicia of retaliatory conduct."
*Dixon v. Gonzales*, 481 F.3d 324, 333-334 (6th Cir. 2007).  *See also Randolph v. Ohio Dep't of
Youth Servs.*, 453 F.3d 724, 737 (6th Cir. 2006) ("although temporal proximity itself is
insufficient to find a causal connection, a temporal connection coupled with other indicia of
retaliatory conduct may be sufficient to support a finding of a causal connection"); *Johnson v.
Univ. of Cincinnati*, 215 F.3d 561, 582 (6th Cir. 2000) (temporal proximity alone does not
support an inference of retaliatory discrimination in the absence of other evidence").

Finally, any asserted inference of a causal connection based on the timing between Plaintiff's August/September 2008 FMLA leave and his December 2008 discharge is defused by the timing of other undisputed facts. *Vereecke v. Huron Valley School Dist.*, 2010 Fed. App. 0177P (6th Cir. 2010). As discussed previously, Defendant alleges that the decision to eliminate Plaintiff's position was based on the fact that he rated the lowest among all of the Production Supervisors evaluated on the November 2008 Re-Selection matrix. (Doc. 35 at 16-17; Doc. 29, Ex. 11). It is also undisputed that this same Re-Selection Worksheet and matrix criteria were used by the same group of managers for purposes of a RIF that occurred in May of 2008 – months before Plaintiff's FMLA leave and his lunch with Mr. Ervin. (Doc. 29, 185-189, Ex. 13). At that time, Plaintiff received the *exact same* total raw point score that he received when the managers conducted the comparative analysis in November of 2008 after his FMLA leave. (*Id.* at 185-189, Exs. 11, 13). In fact, Plaintiff's ratings on each of the criteria on the May 2008 matrix before his FMLA leave were exactly the same as the ratings he received on the November 2008 matrix. (*Id.*, Exs. 11, 13).

Plaintiff's argument that a jury could draw an inference of retaliation based on the fact that Production Supervisor Al Johnson's scores for "Use of Resources" and "Customer/Client Focus" increased from the May 2008 RIF matrix to the November RIF matrix while Plaintiff's scores remained the same is without merit. (Doc. 42 at 15). First, Plaintiff testified that Mr. Johnson had been having a lot of health issues and had missed

-36-

time from work due to a bad foot. (Doc. 32 at 84-86). Therefore, based on Plaintiff's

own testimony, there can be no logical inference that the reason Plaintiff's scores stayed

the same while Mr. Johnson's scores increased was related to Plaintiff's time off for health

reasons. To the contrary, the uncontradicted record evidence is that Mr. Johnson's scores

increased in large part because he took on significant additional responsibilities in the

BVG Plant. (Doc. 28 at 189-190). Plaintiff, by contrast, took on less additional

responsibility in the Flush operations at the time the Company was downsizing in Flush

due to lost business. (*Id*. at 190-191). There simply is no evidence that Plaintiff merited

an increase from a score of "3" to "5" in either of the "Use of Resources" or

"Customer/Client Focus" categories from the May 2008 RIF matrix scoring to the

November 2008 RIF matrix scoring.

Additionally, Plaintiff's assertion that the decisionmakers "arbitrarily" decided to

use 1, 3, and 5 as the scoring scale, instead of 1, 2, 3, 4 and 5, is unsupported by the

record. (Doc. 42 at 16). There is no evidence in the record that the decision to use that

scoring system was arbitrary. The same scoring system was applied to all of the

Production Supervisors who were evaluated for the RIF regardless whether they

happened to have taken time off for health reasons or were in a protected class. *See Smith*

*v. Allstate Ins. Co.*, 195 Fed. Appx. 389, 396 (6th Cir. 2006) ("[T]he fact that the

evaluation system used may not have been the best tool for evaluating employee

performance does not show that the RIF based on evaluations made under that system

was not proper.").[27] Therefore, an argument that the decisionmakers could have or should have used a different scoring system is insufficient as a matter of law to provide an inference of FMLA retaliation or other alleged improper motive.

Accordingly, because Plaintiff has failed to establish a *prima facie* case of FMLA retaliation, his claim is dismissed on summary judgment.

## V.    CONCLUSION

Based on the evidence of record, the Court finds that there are no genuine issues of material fact for trial, and that Defendant is entitled to judgment as a matter of law on all counts of the complaint.  Therefore, Defendant's motion for summary judgment (Doc. 37) is **GRANTED**, and this case is **CLOSED**.

**IT IS SO ORDERED.**

Date:  11/22/10

Timothy S. Black
United States District Judge

---

[27] *Skelton v. Sara Lee Corp.*, 249 Fed. Appx. 450, 462 (6th Cir. 2007) ("[E]ven if we assume that Defendant's evaluation process was haphazard . . . there exists no reasonable inference that Defendant discriminated on the basis of age" because there was no other evidence that this process, although "imperfect," was discriminatory) (*citing Coleman v. Quaker Oats Co.*, 232 F.3d 1271, 1285 (9th Cir. 2000) ("That [the employer] made unwise business judgments or that it used a faulty evaluation system does not support the inference that [it] discriminated on the basis of age.").

-38-